**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JADITZA RUIZ DELGADO, | ) | CASE NO. 1:24-CV-831 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL ARMSTRONG |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OPINION** |
| SECURITY, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

## I.  INTRODUCTION

The Commissioner of Social Security[1] denied Plaintiff Jaditza Ruiz Delgado's application for Supplemental Security Income (SSI) benefits. Ms. Ruiz Delgado seeks judicial review of that decision pursuant to 42 U.S.C. § 1383(c)(3). (Compl., ECF No. 1.) The parties have consented to a magistrate judge exercising jurisdiction over the case pursuant to 28 U.S.C. § 636(c), Rule 73 of the Federal Rules of Civil Procedure, and Local Rule 73.1. (ECF No. 6.)

For the reasons set forth below, the Court AFFIRMS the Commissioner's decision denying Ms. Ruiz Delgado's application for benefits.

## II.  PROCEDURAL HISTORY

Ms. Ruiz Delgado filed several applications in 2019 to the Social Security Administration (SSA) seeking SSI benefits. (Tr. 98, 250, 271.)[2] She identified five conditions that limit her ability to work: (1) lupus, (2) arthritis, (3) chronic pain, (4) fibromyalgia, and (5) osteopenia. (Tr. 294.)

---

[1] Martin O'Malley resigned as Commissioner of Social Security in November 2024. Carolyn W. Colvin served as Acting Commissioner of Social Security from November 2024 to January 20, 2025. Michelle A. King is currently serving as Acting Commissioner.

[2] The administrative transcript appears at ECF No. 7. The Court will refer to pages within that transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 39"). The Court

In April 2019, the agency notified Ms. Ruiz Delgado that she did not qualify for SSI payments because she was not disabled. (Tr. 103.)

Ms. Ruiz Delgado submitted a delayed request for reconsideration in July 2019, and the delayed request was accepted in January 2020. (Tr. 106–07, *see also* Tr. 300 (explaining in Spanish why she had good cause to file her request untimely)).

In July 2021, SSA denied Ms. Ruiz Delgado's claim at the reconsideration level. (Tr. 100, 109.)

Ms. Ruiz Delgado then requested a hearing with an administrative law judge (ALJ). (Tr. 116.)

The ALJ held a hearing on March 30, 2023. (Tr. 45–67.) Ms. Ruiz Delgado testified through an interpreter and was represented by counsel at the hearing. (*See id.*) The ALJ issued a decision on May 17, 2023, finding that Ms. Ruiz Delgado was not disabled. (Tr. 11–44.)

Ms. Ruiz Delgado requested that the SSA Appeals Council review the ALJ's decision, arguing that her osteoarthritis, a recent fracture, and fibromyalgia prohibited standing and walking and caused pain that prevented her from performing light work. (Tr. 247–48.)

On March 14, 2024, the Appeals Council denied Ms. Ruiz Delgado's request to review the ALJ's decision. (Tr. 1–5.)

Ms. Ruiz Delgado filed her complaint seeking judicial review of that decision on May 9, 2024. (Compl., ECF No. 1.) She raises the following assignment of error:

> The ALJ's assessment of Plaintiff's pain did not adhere to SSA regulations and failed to build a logical bridge between the evidence and the residual functional capacity.

(Pl.'s Merits Br., ECF No. 8, PageID# 1361.)

---

will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 8") and page-identification numbers (e.g., "PageID# 1361").

III.     **FACTUAL BACKGROUND**

      **1.   Personal, Educational, and Vocational Experience**

Ms. Ruiz Delgado was born in 1979 and was 39 years old on the date of her application. (Tr. 85.) She graduated high school and has received certifications involving childcare and food preparation. (*See* Tr. 50.) She lives with her two children—a six-year-old and a fourteen-year-old. (Tr. 51.) She does not drive. (Tr. 50.) Ms. Ruiz Delgado performed some clerical work for an election board for four months, but she otherwise has not worked for a long time. (Tr. 51–52.) She had previously worked as a kitchen aide and in childcare. (Tr. 52.)

      **2.   Function Reports**

In February 2019, Ms. Ruiz Delgado told a disability examiner that her depression and anxiety caused her to overeat and have crying spells. (Tr. 88.) She reported that she does not leave her home and has had panic attacks, the most recent occurring a year ago. (*Id.*)

Ms. Ruiz Delgado completed a function report in Spanish in March 2019. (Tr. 276–83.)

In pursuing her administrative appeal, Ms. Ruiz Delgado reported that she has "bad pains in [her] whole body," she needs to sit down in the shower because she is scared that she will fall, and she often gets dizzy. (Tr. 290.) She wrote that she has difficulty brushing her teeth because pain causes her to drop her toothbrush. (Tr. 291.) Her children help her get dressed (she cannot bend to put her socks on because of the pain), make her meals, and help her move around and get into bed. (*Id.*)

      **3.   Relevant Hearing Testimony**

        ***a.      Ms. Ruiz Delgado's Testimony***

Ms. Ruiz Delgado testified that she cannot work because her "body hurts" and because she cannot perform any task involving repetitive hand movements. (Tr. 52.) She described that her

3

hand joints become swollen and painful, to the point that she has difficulty holding a knife. (*Id.*) She is right-handed. (Tr. 55.) She cannot reach over her head, but she can reach for objects in front of her if she does not "have to stretch out [her] hands so much." (*Id.*)

She cannot stand for long periods of time; when last she tried working, she found that she could not "stand being in a workplace for more than two hours." (Tr. 51–52.) She has not performed any housework in two or three years. (Tr. 51.) Her older daughter gets herself ready for school, helps with day-to-day chores, and helps get the younger daughter ready for school. (Tr. 51.)

Ms. Ruiz Delgado testified that she wakes up numb due to arthritis. (Tr. 51.) She spends all day at home. (*Id.*) She sometimes watches television but cannot make it through a two-hour movie because she falls asleep. (Tr. 56.)

Ms. Ruiz Delgado is scheduled for surgery to remove screws from her right foot. (Tr. 53.) She receives pain-management injections due to swelling in her hips. (*Id.*) After her surgery, she intends to participate in physical therapy. (*Id.*)

Ms. Ruiz Delgado estimated that she could only lift or carry items weighing three pounds or less. (Tr. 55.) She can stand for only five minutes before needing to sit down. (*Id.*) She can walk short distances, "anything inside the house." (*Id.*) After sitting for between five and fifteen minutes, she finds herself needing to "move a lot." (*Id.*) She can walk up and down "[n]o more than four steps." (*Id.*) She cannot get down on her knees and is not able to crawl. (Tr. 55–56.)

Ms. Ruiz Delgado underwent weight-loss surgery in June 2020. (Tr. 53.) She lost 100 pounds, after which she has felt "a little better." (*Id.*)

Ms. Ruiz Delgado also testified that she has trouble interacting with people and remembering things. (Tr. 56.) She gets "desperate" when she is around a large group of people.

(*Id.*) She forgets her appointments and she uses an alarm and an agenda to help her remember to take her medications. (*Id.*) She experiences a panic attack between three and five times per week. (Tr. 57.) She finds that these attacks are triggered by leaving her house, the thought of going to a hospital, and talking about her conditions. (*Id.*) She speaks with a mental health counselor once a week to assist with these difficulties. (*Id.*)

### b.       *Vocational Expert's Testimony*

Vocational expert Susan Rowe testified that Ms. Ruiz Delgado's previous work with the election board was properly classified as that of an "election worker" (DOT 205.367-030), a sedentary position at the second specific-vocational-preparation level (SVP 2). (Tr. 59.)

The ALJ asked the expert to consider a hypothetical person of the same age, education, and employment background as Ms. Ruiz Delgado who could perform work at the light exertional level with the following additional limitations: the person could only occasionally climb ramps and stairs and could never use ladders, ropes, or scaffolding; the person could frequently balance but could only occasionally stoop, kneel, crouch, or crawl; they could not be exposed to extreme temperatures, concentrated vibration, hazardous industrial machinery, unprotected heights, or commercial driving; they could perform simple, routine tasks with simple, short instructions; they could make simple decisions; they could be exposed to occasional workplace changes but could not work a position with strict production rates or hourly quotas; and they could only have occasional interaction with coworkers, supervisors, or the public. (Tr. 59–60.)

The expert opined that such a person would not be able to perform Ms. Ruiz Delgado's past work as an election worker, but the person could perform other work that exists in the economy. (Tr. 60.) The expert identified that such a person could perform the work of a "laundry

packager" (DOT 920.687-018), "bakery racker" (DOT 524.687-018), or "clothing sorter" (DOT 222.687-014). (*Id.*)

The ALJ next asked the expert to assume that the hypothetical person would be limited to sedentary work. (*Id.*) The expert identified that such a person could perform the work of an "inspector" (DOT 669.687-014), "final assembler" (DOT 713.687-018), or "table worker" (DOT 739.687-182). (Tr. 61.)

The ALJ next asked the expert to assume that the hypothetical person would require three unscheduled breaks per day, each lasting ten minutes, in addition to routine work breaks. (Tr. 61.) The expert opined that this additional limitation would be work-preclusive if the breaks were needed every day. (*Id.*)

In response to questions from Ms. Ruiz Delgado's counsel, the expert opined that all the light- and sedentary-level positions identified would be eliminated if the hypothetical person was also limited to only occasional handling and fingering. (Tr. 62.) The expert further opined that it would be work-preclusive if a person is off-task more than ten percent of the workday on a regular, ongoing basis. (Tr. 62–63.) Similarly, it is work-preclusive for an unskilled worker to be absent two or more days per month on an ongoing basis. (Tr. 63.)

In response to follow-up questions from the ALJ, the expert opined that if the hypothetical person could frequently handle and finger, they could perform any of the light- or sedentary-level positions identified except that of the "bakery racker." (Tr. 63–64.) However, there are other positions at the light exertional level that the person could perform, including that of a "first inspector" (DOT 727.687-054). (Tr. 64.)

### 4. **State Agency Medical Consultants**

In February 2019, a disability examiner (Efrain Perez), a physician (Lynne Torello, M.D.), and a psychologist (Jaime Lai, Psy.D.) reviewed the record at the initial administrative level. (Tr. 85–98.) After their review, the consultants determined that Ms. Ruiz Delgado was not disabled, adopting the residual-functional-capacity findings from the agency's May 19, 2017 decision and concluding that Ms. Ruiz Delgado could perform her past relevant work as an election worker. (Tr. 91, 95–97.) The consultants explained that—while Ms. Ruiz Delgado had fibromyalgia with pain in multiple joints and had decreased range of motion in her shoulders, back, and hips due to pain—she retained normal strength in her arms and legs and is able to walk normally. (Tr. 97, 103.) They concluded that Ms. Ruiz Delgado could stand or walk for around six hours in a normal workday and could lift 20 pounds occasionally. (*Id.*) And they found that Ms. Ruiz Delgado retained the mental ability to perform tasks that are simple and routine in nature. (*Id.*)

In July 2021, a disability examiner (Matthew Welsh) and a physician (Dana Schultz, M.D.), reviewed the record at the reconsideration level and affirmed the finding that Ms. Ruiz Delgado is not disabled. (Tr. 100, 109, 115.) The agency communicated the decision to Ms. Ruiz Delgado, explaining that it had concluded that she retained the ability to perform light work (except that she could not use ladders, ropes, or scaffolds) and "simple and repetitive tasks in a static work environment without strict production quotas." (Tr. 110.)

In August 2021, a psychologist (David Dietz, Ph.D.) reviewed the record and concluded that the agency's initial findings as to Ms. Ruiz Delgado's mental RFC "appear to continue to be supported." (Tr. 494.) A physical RFC assessment in the record indicates that Ms. Ruiz Delgado can stand or walk for six hours and sit for six hours in a normal workday, with certain postural limitations. (Tr. 512–13.) No manipulative limitations were noted. (Tr. 514.)

5.  **Relevant Medical Evidence**

Ms. Ruiz Delgado consulted with rheumatologist Dr. Margaret Tsai in October 2018. (Tr. 338.) Ms. Ruiz Delgado described that she had had "all over pain" since she was a teenager and the pain had worsened over the last two years in her shoulder, upper and lower back, hands, and wrists. (*Id.*) Dr. Tsai evaluated that Ms. Ruiz Delgado's ambulation was "fair without assistance or without assistive devices." (Tr. 340.) A physical evaluation revealed no joint deformities, rheumatoid nodules, calcifications, or tophi. (Tr. 340.) There was tenderness and decreased range of motion due to pain, but no clinical synovitis. (*Id.*)

Dr. Tsai ordered lab tests and imaging and recommended that Ms. Ruiz Delgado exercise 30 minutes per day several times per week, engage in weight-bearing exercises like walking, and perform flexibility and strength-training exercises (except that Ms. Ruiz Delgado should avoid jumping, running, or movements that would have her bend forward and twist at the waist). (Tr. 341.)

X-ray imaging revealed mild flexion deformities of the fifth finger on Ms. Ruiz Delgado's hands; mild narrowing of the hips; mild curvature of the lumbar spine; and osteophytes, "degenerative joint disease/osteoarthritis" of the shoulders. (Tr. 336.)

Ms. Ruiz Delgado had a telephone appointment with Dr. Tsai on October 20, 2018. (Tr. 335.) Dr. Tsai noted that a measurement of Ms. Ruiz Delgado's bone mineral density showed osteopenia. (*Id.*) Dr. Tsai started her on a bisphosphonate medication (Fosamax) for the condition. (*Id.*)

Ms. Ruiz Delgado consulted with Dr. Girgis on January 25, 2019. (Tr. 327.) She complained of whole-body pain over the past several years that varied between a five and a ten, on a scale of one to ten. (*Id.*) She described that the pain was aggravated by sitting, getting up from

sitting, standing, and walking. (*Id.*) She said she had trouble falling asleep and staying asleep. (Tr. 328.) Dr. Girgis's physical exam was "suggestive of fibromyalgia"; she had tenderness in the bilateral cervical facets, bilateral cervical paraspinal muscles, over the lumbar spine, the bilateral lumbar facets and lumbar paraspinal muscles, thoracic spine, bilateral thoracic facets and bilateral thoracic paraspinal muscles, and "all over" her upper and lower extremities and joints. (Tr. 329–30.) Dr. Girgis started Ms. Ruiz Delgado on a selective serotonin and norepinephrine reuptake inhibitor (Cymbalta), referred her to a fibromyalgia clinic, and ordered physical therapy. (Tr. 330.)

Ms. Ruiz Delgado met with Jessica Hill, a pain-management nurse practitioner, on March 18, 2019. (Tr. 697.) She complained of all-over pain between a five and a ten on the pain scale. (*Id.*) A physical examination revealed tenderness in the shoulders and over the cervical and lumbar spine, facets, and paraspinal muscles. (Tr. 699–700.) Ms. Ruiz Delgado reported that physical therapy had helped with her pain. (Tr. 700.) Ms. Hill started Ms. Ruiz Delgado on Lyrica and advised that she continue with physical therapy. (Tr. 701.)

Ms. Ruiz Delgado underwent a clinical evaluation with psychologist James Spindler, M.S., on March 28, 2019. (Tr. 425.) Mr. Spindler assessed that Ms. Ruiz Delgado "appear[ed] to be functioning in the average range of intelligence" and "ha[d] an adequate level of knowledge and skills necessary for independent living"; her "judgment seem[ed] reliable for most routine matters." (Tr. 428.) Ms. Ruiz Delgado seemed "mildly depressed" and "nervous" during the interview. (Tr. 427.) Mr. Spindler concluded that Ms. Ruiz Delgado had depressive and anxiety disorders, but he opined that she (1) seemed capable of understanding, remembering, and carrying out instructions in most job settings, (2) "undoubtedly" had the ability to sustain a working pace and maintain a level of attention and concentration adequate for most job settings, (3) seemed

9

capable of responding appropriately to supervision and coworkers, and (4) seemed capable of responding appropriately to routine work pressures. (Tr. 429–30.)

Ms. Ruiz Delgado consulted with Dr. Tsai on April 5, 2019. (Tr. 563.)  She complained of all-over pain at a ten on the pain scale. (*Id.*)

In May 2019, Ms. Ruiz Delgado fell and sustained a fracture to her right leg; the fracture was addressed through open-reduction-and-internal-fixation (ORIF) surgery. (Tr. 330–31, 985.)

Ms. Ruiz Delgado met with Ms. Hill on June 20, 2019. (Tr. 680.) She complained of all-over pain between a four and a ten on the pain scale. (*Id.*) A physical examination revealed "extreme" tenderness over the cervical and lumbar spine, facets, and paraspinal muscles. (Tr. 683.) Ms. Hill increased the dosage of Cymbalta and started Ms. Ruiz Delgado on Celebrex. (*Id.*)

In August 2019, Dr. Tsai advised that Ms. Ruiz Delgado follow up with a pain clinic for long-term pain management. (Tr. 562, 643.) The doctor advised that Ms. Ruiz Delgado should perform low-impact weightbearing exercise. (*Id.*)

Ms. Ruiz Delgado met with Ms. Hill on August 19, 2019. (Tr. 654.) She complained of all-over pain between a four and a ten on the pain scale. (*Id.*) A physical examination revealed tenderness over the cervical and lumbar spine, facets, and paraspinal muscles. (Tr. 657.) Ms. Hill increased her dosage of Cymbalta. (Tr. 658.)

Ms. Ruiz Delgado met with Ms. Hill on December 16, 2019. (Tr. 627.) She complained of pain between a three and a nine on the pain scale. (*Id.*) X-ray imaging in June and August 2019 revealed "small marginal spurs with joint space narrowing" at the acromioclavicular joint in the shoulder and no abnormalities in the cervical spine. (Tr. 630, 650, 676.) She was continued on her medication. (Tr. 631.)

Ms. Ruiz Delgado consulted with Dr. Tsai in January and March 2020, complaining of pain at a six to seven on the pain scale. (Tr. 562, 607, 617.)

Ms. Ruiz Delgado described chronic pain, lupus, arthritis, fibromyalgia, and her recent compound fracture as stressors in mental-health consultations in summer and fall of 2020. (Tr. 431–32, 441 ("she is in pain all the time"), 447, 453, 465 ("has not been feeling good [because] of her lupus")). Other mental health records reflect that Ms. Ruiz Delgado reported being "very busy helping her children" attend online classes and said she was toilet training her youngest child. (Tr. 468, 474.)

Ms. Ruiz Delgado consulted with Dr. Tsai in September 2020, complaining of pain at a seven on the pain scale. (Tr. 561, 599.) In September 2020, x-ray imaging revealed that Ms. Ruiz Delgado's tibial fracture had healed; no degenerative changes were noted. (Tr. 526.) Imaging in November 2020 revealed mild dextroconvex scoliosis of the lumbar spine with moderate facet degenerative changes at the L4–L5 and L5–S1 levels. (Tr. 556–57.)

Ms. Ruiz Delgado met with Ms. Hill on November 21, 2020. (Tr. 594.) She complained of all-over pain between a five and ten on the pain scale. (*Id.*) A physical examination revealed tenderness over the cervical and lumbar spine, facets, and paraspinal muscles. (Tr. 597.) She was continued on her medication, and x-ray imaging was ordered. (Tr. 598.) The imaging revealed no bony or joint abnormality in the cervical spine. (Tr. 584.) There was mild levoscoliosis of the lower thoracic spine. (Tr. 586.) There was dextroconvex scoliosis of the lumbar spine, with moderate facet degenerative changes noted. (Tr. 588.)

Ms. Ruiz Delgado met with Ms. Hill on January 5, 2021. (Tr. 578.) Ms. Ruiz Delgado complained of all-over pain between a three and a ten on the pain scale. (*Id.*) A physical examination revealed tenderness over the cervical and lumbar spine, facets, and paraspinal

muscles. (Tr. 581.) The plan was to continue with medication and participate in physical therapy. (Tr. 582.)

Ms. Ruiz Delgado consulted with Shubhrit Benipal, a pain-management nurse practitioner, on January 27, 2021, regarding a neck strain. (Tr. 576.) A physical examination revealed spasms and tenderness over the cervical back but no tenderness in the lumbar back. (Tr. 577.)

Ms. Ruiz Delgado met with Ms. Hill on March 2, 2021. (Tr. 571.) Ms. Ruiz Delgado complained of all-over pain between a one and a ten on the pain scale. (*Id.*) A physical examination revealed tenderness over the lumbar spine and bilateral lumbar paraspinal muscles. (Tr. 574.) She had an antalgic gait. (*Id.*) Ms. Hill continued her on her medication. (*Id.*)

On March 22, 2021, Ms. Ruiz Delgado consulted with Dr. Tsai. (Tr. 561.) It was noted that her joint pain and swelling had improved, but she complained of continuing pain of between a two and a five on the pain scale. (*Id.*) She was "mildly uncomfortable but happy" with her medical care. (*Id.*) Dr. Tsai wrote that Ms. Ruiz Delgado has "findings consistent with generalized pain" due to chronic fibromyalgia and other conditions. (Tr. 566.) Among other recommendations, Dr. Tsai recommended that Ms. Ruiz Delgado exercise three to five times per week and perform weight-bearing exercises like walking, dancing, stair climbing, using an elliptical machine, and gardening. (Tr. 568.)

On April 20, 2021, Ms. Ruiz Delgado consulted with Ms. Hill. (Tr. 553.) Ms. Ruiz Delgado complained of "all over" pain that varies between a two and a ten on the pain scale and which is aggravated by sitting, standing, and walking. (*Id.*) A physical examination revealed tenderness over the bilateral lumbar facets and bilateral lumbar paraspinal muscles. (Tr. 556.) Ms. Ruiz Delgado reported that she could not continue physical therapy because of worsening pain. (Tr. 557.) Ms. Hill ordered magnetic-resonance imaging. (*Id.*)

12

Ms. Ruiz Delgado underwent a disability physical exam with Dr. Jim Bircher on May 8, 2021. (Tr. 480.) Dr. Bircher assessed that Ms. Ruiz Delgado had good hand–eye coordination, no balance problems, and a normal gait pattern without the use of an assistive device. (Tr. 483.) There was no swelling or tenderness of the joints, although the index and middle fingers on the right hand displayed swan-neck deformities. (Tr. 483.) Ms. Ruiz Delgado was able to lift, carry, and handle light objects during the examination, and she had "no difficulty getting up and down" from a seated position at a table. (*Id.*) Dr. Bircher opined that she had normal strength and range of motion bilaterally, except that she had limited shoulder motion (60 degrees, out of 90) and lumbar spine motion (120 degrees, out of 180). (Tr. 484, 488.) Ms. Ruiz Delgado had normal fine-motor coordination and handling. (*Id.*) Dr. Bircher wrote that she "may be incapable to walk for over an hour, sit for more than an hour at a time, sand for over and hour, or lift 20 pounds due to back pain." (*Id.*) But he concluded that she "does not have any substantial physical limitations" and opined that her "medical conditions seem well controlled on current medications." (*Id.*)

On May 12, 2021, Ms. Ruiz Delgado again consulted with Ms. Hill. (Tr. 546.) Ms. Ruiz Delgado again complained of "all over" pain that is aggravated by standing and walking, but it was noted that the pain was mitigated by sitting. (*Id.*) A physical examination again revealed tenderness over the lumbar spine, bilateral lumbar facets, and bilateral lumbar paraspinal muscles. (Tr. 549.) She had an antalgic gait. (*Id.*) Magnetic-resonance imaging revealed "minimal" facet degenerative changes at the L4–L5 level, "mild to moderate" changes at the L5–S1 level, and potentially "minimal scoliosis" in the lower lumbar spine. (*Id.*) Ms. Ruiz Delgado was referred for pain injections in the spine and was advised to continue on her medication. (Tr. 551.)

On May 26, 2021, Ms. Ruiz Delgado received pain injections in her spine. (Tr. 544–45.)

Ms. Ruiz Delgado met with Ms. Hill in June 2021. (Tr. 852.) X-ray imaging revealed no significant degenerative changes in the cervical spine. (Tr. 848.) Ms. Ruiz Delgado reported that recent pain injections afforded her 30 percent pain relief. (Tr. 856.) She then followed up with Dewanda Porter, CNP, regarding neck pain that was exacerbated by reaching for an item on a high shelf at a store. (Tr. 858.)

Ms. Ruiz Delgado met with Ms. Hill on July 23, 2021. (Tr. 842.) She complained of pain of between a five and a nine on the pain scale, had tenderness over the lumbar spine, and she was started on Topamax. (*Id.*)

Ms. Ruiz Delgado consulted with Dr. Tsai on September 27, 2021. (Tr. 794, 832.) She complained of chronic upper back pain, but Dr. Tsai noted that the chronic pain in her shoulders, hands, elbows, and back were stable. (*Id.*)

On February 4, 2022, Ms. Ruiz Delgado met with Ms. Hill. (Tr. 818.) She had tenderness over the cervical and lumbar spine on examination and complained of worsening all-over pain. (Tr. 821.) Ms. Hill increased the dosage of her Topamax. (*Id.*)

Ms. Ruiz Delgado consulted with Dr. Tsai on February 14, 2022. (Tr. 794, 808.) She complained of weakness and pain in her thighs, hips, and upper back, and chronic pain in her low back, hips, shoulders, and elbows. (*Id.*)

Ms. Ruiz Delgado consulted with Dr. Tsai on April 11, 2022. (Tr. 793.) She complained of continued pain in her hips, extending down her right leg into her foot, with an intensity of seven on the pain scale. (*Id.*)

On May 9, 2022, Ms. Ruiz Delgado met with Ms. Hill again. (Tr. 782.) She complained of pain in the low back and right leg of between a six and a ten on the pain scale. (*Id.*) Physical examination revealed no pain in the lumbar spine and full range of motion in the back. (Tr. 785.)

She had full range of motion in the hips, albeit with pain in the right hip. (*Id.*) Ms. Ruiz Delgado reported that her low back and fibromyalgia pain have been "under good control" with medication. (*Id.*) X-ray imaging of the hip revealed no erosive changes but again reflected moderate joint-space narrowing. (Tr. 790.)

In May 2022, Ms. Ruiz Delgado consulted with Dr. Scott Ciaccia regarding knee and ankle pain in the right leg. (Tr. 523.) A physical exam confirmed some tenderness around the anterior joint line. (Tr. 524.) X-ray imaging was unremarkable. (Tr. 525.) Ms. Ruiz Delgado received a lidocaine injection and was asked to follow up in six weeks. (*Id.*)

The same month, Ms. Ruiz Delgado consulted with Dr. Brett McCoy regarding hip and groin pain that was radiating down into her legs, accompanied by occasional numbness and tingling. (Tr. 519.) X-ray imaging again revealed joint-space narrowing of the bilateral hip joints "consistent with moderate degenerative joint disease"; no significant degenerative changes were noted. (Tr. 519.) A physical exam revealed an antalgic gait, and there was no tenderness over the lumbar spine or greater trochanter. (Tr. 520.) Ms. Ruiz Delgado had full forward flexion and symmetric motion. (*Id.*) Dr. McCoy recommended conservative treatment like rest, ice, anti-inflammatory medication, and targeted steroid injections. (*Id.*)

Ms. Ruiz Delgado consulted with Amy Emerick, CNP, for pain-management injections on October 11, 2022. (Tr. 722, 736.) Ms. Ruiz Delgado presented with a normal gait. (Tr. 737.) Ms. Emerick noted that Ms. Ruiz Delgado's lupus was in remission with medication, her bone density was improved and she had no pain or joint swelling beyond occasional morning stiffness. (Tr. 738; *see also* Tr. 824 (reflecting increased bone density)). She was again advised to exercise three to five times per week and perform weight-bearing exercises. (Tr. 724.)

In March 2023, Ms. Ruiz Delgado met with Josephine Sabharwal, M.D., for psychiatric evaluation. (Tr. 1321.) She complained of "constant, unbearable" pain at a seven to nine on the pain scale. (*Id.*)

## IV.  DECISION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ determined that Ms. Ruiz Delgado had not engaged in substantial gainful activity since July 31, 2019. (Tr. 17.)

The ALJ further determined that Ms. Ruiz Delgado has the following severe impairments: (1) systemic lupus erythematosus (SLE); (2) degenerative joint disease of the bilateral hips; (3) degenerative disc disease of the lumbar spine; (4) fibromyalgia; (5) chronic pain syndrome; (6) major depressive disorder; (7) generalized anxiety disorder; and (8) panic disorder. (*Id.*)

The ALJ found that Ms. Ruiz Delgado also had several non-severe physical impairments, those being: mild scoliosis, osteoporosis, mild degenerative joint disease in the bilateral shoulders, gastroesophageal reflux disease (GERD), and "right leg/ankle fracture." (*Id.*) The ALJ noted that she considered all of Ms. Ruiz Delgado's impairments, including these non-severe impairments, in determining Ms. Ruiz Delgado's residual functional capacity. (*Id.*)

The ALJ next found that Ms. Ruiz Delgado does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 18.)

The ALJ determined that Ms. Ruiz Delgado had the residual functional capacity to perform light work, except that (1) she could only occasionally climb ramps or stairs and could never climb ladders, ropes, or scaffolds; (2) she could frequently balance but could only occasionally stoop, kneel, crouch, or crawl; (3) she could not be exposed to temperature extremes, concentrated vibration, or "hazards such as industrial machinery or unprotected heights"; (4) she could not drive

commercially; (5) she was "limited to simple, routine tasks, with simple short instructions, and simple decisions"; and (6) she must be in a workplace with only occasional workplace changes, with no strict production rate or hourly quotas, and with only occasional interactions with coworkers, supervisors, and the public. (Tr. 25.)

The ALJ next determined that Ms. Ruiz Delgado was unable to perform her past relevant work as an election worker, reasoning that her mental functional limitations precluded that work. (Tr. 37.) However, the ALJ determined that—considering Ms. Ruiz Delgado's age, education, work experience, and residual functional capacity—there are jobs that exist in significant numbers in the national economy that she could perform, including work as a "laundry packager" (DOT 920.687-018), "bakery racker" (DOT 524.687-018), or "clothing sorter" (DOT 222.687-014).[3]

Accordingly, the ALJ determined that Ms. Ruiz Delgado was not disabled. (Tr. 39.)

## V.    LAW AND ANALYSIS

### A.    Standard of Review

Whether reviewing a decision to deny SSI benefits (undertaking the review authorized by 42 U.S.C. § 1383(c)(3) or a decision to deny disability insurance benefits (reviewing under 42 U.S.C. § 405(g)), the Court uses the same standard of review. *See* 42 U.S.C. § 1383(c)(3) (final determinations under 42 U.S.C. § 1383 "shall be subject to judicial review as provided in [§] 405(g) . . . to the same extent as . . . final determinations under [§] 405 . . . .").

---

[3] These jobs refer to entries in the U.S. Department of Labor's *Dictionary of Occupational Titles*. The DOL no longer publishes the tool—*see Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014)—but the most recent version, from 1991, is available online through the DOL's Office of Administrative Law Judges Law Library. *Dictionary of Occupational Titles—Fourth Edition, Revised 1991*, U.S. DEPT. OF LABOR OFF. OF ADMIN. L. JUDGES, https://www.dol.gov/agencies/oalj/topics/libraries/LIBDOT.

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983).

In addition to considering whether the Commission's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA failed to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B.      Standard for Disability

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform work in the national economy. *Id.*

### C.      Analysis

Ms. Ruiz Delgado contends that the ALJ erred when crafting the RFC, arguing that the ALJ ignored certain evidence in the record when the ALJ concluded that Ms. Ruiz Delgado's

description of the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence. (Pl.'s Merits Br., ECF No. 8, PageID# 1361–62.)

An individual's residual functional capacity (*i.e.*, the most an individual can still do despite applicable limitations) is an administrative decision reserved for the ALJ. 20 C.F.R. § 1546(c). The ALJ assesses an individual's RFC based on all relevant evidence of record. 20 C.F.R. § 404.1545(a)(1). It is well-established that an ALJ need not discuss each piece of evidence or limitation considered. *See, e.g.*, *Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r of Sec.*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004)) (finding an ALJ need not discuss every piece of evidence in the record). But courts do not hesitate to remand where an ALJ selectively considers only portions of the medical evidence that place that claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See, e.g.*, *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *see also Ackles v. Colvin*, No. 3:14CV00249, 2015 WL 1757474, at *6 (S.D. Ohio Apr. 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

Here, Ms. Ruiz Delgado argues that the ALJ relied too heavily on "a series of details in the record where physical findings were normal" while ignoring "the objective evidence which demonstrated or supported pain." (*Id.* at PageID# 1363.) She points to Dr. Tsai's diagnoses of lupus, osteopenia, degenerative joint disease, narrowing of the hips, dextroscoliosis of the spine,

and deformities of the fingers. (*Id.* at PageID# 1364 (citing Tr. 336)). She directs the Court to records from Cleveland Clinic pain-management professionals, wherein Ms. Ruiz Delgado describes her "all over" pain and where examinations revealed tenderness. (*Id.* (citing (Tr. 327)). She reads the records from her course of treatment to reflect unmanaged and reproducible pain, causing decreased range of motion and an antalgic gait, despite medication and despite attempting physical therapy. (*See id.* at PageID# 1364–66.) She concludes that the record evidence supports a finding that Ms. Ruiz Delgado's pain was so severe that she could not sustain an eight-hour workday at any exertional level. (*Id.* at PageID# 1366.)

When a claimant alleges symptoms of disabling severity, an ALJ must follow a two-step process for evaluating these symptoms. *See Moore v. Comm'r of Soc. Sec.*, 573 Fed. App'x 540, 542 (6th Cir. Aug. 5, 2014); *Massey v. Comm'r of Soc. Sec.*, 2011 WL 383254 at * 3 (6th Cir. Feb. 7, 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1). *See also* SSR 16-3p, 2016 WL 1119029 (March 16, 2016).

In evaluating a claimant's symptoms at the second step of the analysis, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. Beyond medical evidence, there are seven factors that the ALJ should consider. These factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment,

21

other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 2016 WL 1119029 at * 7.[4]

The ALJ is not required to discuss each of these factors or even all the evidence in the record but need only acknowledge the factors and discuss the evidence that supports their decision. *See Bryson v. Comm'r of Soc. Sec.*, 2021 WL 2735993 at * 14 (N.D. Ohio June 10, 2021), *adopted by*, 2021 WL 2720071 (N.D. Ohio July 1, 2021). However, "[i]n evaluating an individual's symptoms, it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.'" SSR 16-3p, 2016 WL 1119029 at * 9. Rather, an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.*; *see also Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so.").

---

[4] The Social Security Administration ("SSA") previously characterized the evaluation of a claimant's subjective symptom complaints as a "credibility" determination. *See* SSR 96-7p, 1996 SSR LEXIS 4 (July 2, 1996). In March 2016, however, the SSA issued SSR 16-3p. Therein, the SSA explained that this characterization did not accurately reflect the language in the regulations and eliminated the term "credibility" from its sub-regulatory policy. *See* SSR 16-3p, 2016 WL 1119029 (Oct. 25, 2017). The SSA explained that "subjective symptom evaluation is not an examination of an individual's character," but is instead an examination of the subjective complaints' consistency with other evidence in the record. SSR 16-3p, 2016 WL 1119029. Despite these changes in terminology, courts have concluded that SSR 16-3p did not substantially change existing law on this issue. *See Banks v. Comm'r of Soc. Sec.*, 2018 WL 6060449 at *5 (S.D. Ohio Nov. 20, 2018) (quoting language in SSR 16-3p that states intention to "clarify" and not to substantially "change" existing SSR 96-7p), *adopted at* 2019 WL 187914 (S.D. Ohio Jan. 14, 2019).

An ALJ is not required to accept the claimant's complaints at face value but may discount them based on his consideration of the above factors. *See Dooley v. Comm'r of Soc. Sec.*, 656 Fed. App'x 113, 119 (6th Cir. 2016); *Bryson*, 2021 WL 2735993 at *15. In light of the ALJ's opportunity to observe the claimant's demeanor, the ALJ's evaluation of a claimant's subjective symptoms is entitled to considerable deference and should not be discarded lightly. *See Dooley*, 656 Fed. App'x at 119 ("[A]n ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.'") (quoting *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007)); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *Jidas v. Comm'r of Soc. Sec.*, 2019 WL 2252289 at *8–9 (E.D. Mich. Feb. 26, 2019), *adopted by*, 2019 WL 1306172 (E.D. Mich. March 22, 2019). Indeed, a reviewing court should not disturb an ALJ's credibility determination "absent [a] compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001); *see also Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 788 (6th Cir. 2017) (noting that "while an ALJ's credibility determinations must be supported by substantial evidence, we accord them special deference"); *Hernandez v. Comm'r of Soc. Sec.*, 644 Fed. App'x 468, 476 (6th Cir. 2016) (noting that, "in practice ALJ credibility findings have become essentially 'unchallengeable.' "); *Riebe v. Comm'r of Soc. Sec.*, 2019 WL 4600628 at * 7–8 (N.D. Ohio Sept. 23, 2019) (same).

The Commissioner defends the ALJ's decision by pointing out that the ALJ summarized Ms. Ruiz Delgado's subjective complaints before analyzing those complaints in light of the record, pointing to specific evidence that was inconsistent with those complaints. (*See* Def.'s Merits Br., ECF No. 11, PageID# 1383.) The Commissioner argues that the RFC is supported by sufficient evidence—pointing specifically to the fact that it was consistent with the findings of the state

agency consultants—and says that Ms. Ruiz Delgado is simply asking the Court to reweigh the evidence. (*Id.* at PageID# 1385–86.)

After a careful review, the Court finds that the ALJ complied with agency regulations in evaluating Ms. Ruiz Delgado's subjective statements about the symptoms and limiting effect of her conditions and that substantial evidence supports the ALJ's determination of Ms. Ruiz Delgado's RFC. The ALJ carefully considered Ms. Ruiz Delgado's reported symptoms, her hearing testimony, and the years of medical records in evidence.

The standard for "substantial evidence" is "not high." *Biestek*, 139 S.Ct. at 1154. "The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). A reviewing court may not "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

Here, the ALJ did not "cherry-pick" evidence to support a finding that Ms. Ruiz Delgado was not disabled. To the contrary, the ALJ carefully and accurately summarized the medical records in evidence (Tr. 29–33) and correctly concluded that Ms. Ruiz Delgado's reported symptoms were partially, but not fully, consistent with the record evidence. (Tr. 27.) In doing so, the ALJ accurately and comprehensively discussed Ms. Ruiz Delgado's reported symptoms (Tr. 26–27) and correctly appreciated that the symptoms of fibromyalgia can "wax and wane," such

that a person has "good days and bad days." (Tr. 25.) The ALJ specifically remarked on the medical imaging and physical examinations showing degenerative changes, tenderness, swelling, and antalgic gait and ultimately concluded that Ms. Ruiz Delgado's impairments could reasonably be expected to cause her alleged symptoms. (Tr. 27–28, 30–31.)

The ALJ then thoroughly explained—in light of the SSR 16-3p factors—why Ms. Ruiz Delgado's reported functional limitations were only partially inconsistent with the medical evidence. For instance, the ALJ relied on the May 2021 consultative examination, wherein Ms. Ruiz Delgado had good hand – eye coordination and balance and was able to walk; lift, carry, and handle objects; and get up and down from a table easily. (Tr. 28.) The ALJ noted consistent findings that Ms. Ruiz Delgado's strength and muscle tone were normal over the years. (*Id.*) And the ALJ noted that her gait was inconsistently assessed as both antalgic and normal, most recently as normal. (Tr. 28–29.) The ALJ did not find Dr. Bircher's opinion to be persuasive, noting that Dr. Bircher found that Ms. Ruiz Delgado may have significant limitations but also found fairly normal range of motion and stated that she has no substantial physical limitations. (Tr. 34.) The ALJ ultimately, and reasonably, concluded that "the longitudinal record does not reflect a significant degree of physical functional limitation from the claimant's physical impairments." (Tr. 31.) *See also Pifer v. Comm'r of Soc. Sec.*, Case No. 1:21-CV-00314-CEH, 2022 WL 1521911 (N.D. Ohio May 13, 2022) (affirming where the ALJ considered the claimant's subjective allegations and gave a thorough explanation as to why he found those allegations inconsistent with the medical evidence).

All this is to say that the ALJ's decision addresses Ms. Ruiz Delgado's subjective complaints and explains why those complaints are not entirely consistent with the record. The Court is convinced that the ALJ considered all the relevant evidence and that a reasonable mind

might accept the record evidence as adequate to support the ALJ's findings. The RFC is consistent with the opinions of the state agency consultants. The Court further notes that the most recent medical records in evidence from pain-management and rheumatology specialists, from 2022, reflect a conservative plan of treatment, improved bone density, and a lack of further degenerative changes. (*See* 519, 520, 525, 722, 724, 736.) Ms. Emerick, CNP, noted in October 2022 that Ms. Ruiz Delgado had a normal gait, that her lupus was in remission with medication, and that she had no pain beyond occasional morning stiffness. (Tr. 722, 736, 738.) Over the years, and as recently as that October 2022 appointment, Ms. Ruiz Delgado was repeatedly encouraged to walk, climb stairs, and perform other weight-bearing exercises.

To the extent Ms. Ruiz Delgado believes the ALJ should have weighed the evidence differently and imposed greater limitations, it is not a reviewing court's role to second guess the ALJ's determination. *See Jones*, 336 F.3d at 477. The Court is convinced that there is no compelling reason for the Court to disturb the ALJ's findings. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732 (N.D. Ohio 2005).

Accordingly, Ms. Ruiz Delgado's assignment of error is overruled.

## VI. CONCLUSION

Based on the foregoing, the Court AFFIRMS the Commissioner's decision denying Ms. Ruiz Delgado's application for benefits.


**IT IS SO ORDERED.**


Dated:  February 6, 2025                              */s Jennifer Dowdell Armstrong*
                                                     JENNIFER DOWDELL ARMSTRONG
                                                     UNITED STATES MAGISTRATE JUDGE

26